### APPEAL OF PARISH-WATSON & CO., INC.

Docket No. 4894. Decided July 31, 1926.

1. Upon incorporation of a joint venture, a portion of the property acquired by the corporation was transferred to it at cost to the joint venturers under a written agreement which provided that the net profits arising from the sale of such property, irrespective of any dividends upon the capital stock of such corporation resulting from other business, should be paid to the joint venturers. *Held*, that such net profits constituted taxable income of the individuals and not of the corporation.

2. Upon the evidence submitted, *held*, that under the terms of an agreement entered into in July, 1920, between the taxpayer and a prospective purchaser of certain personal property specified therein, no sale was completed during the years 1920 or 1921, and no profit was realized from the agreement during those years.

*James H. Hayes, Esq.*, and *Lawrence A. Baker, Esq.*, for the petitioner.

*J. Arthur Adams, Esq.*, for the Commissioner.

Before LITTLETON, SMITH, and TRUSSELL.

This proceeding involves the determination of deficiencies in income and profits tax for the calendar years 1920 and 1921 in the amounts of $59,807.68 and $393.97, respectively. The issues are (1) whether, under the terms of a contract between certain joint venturers and the petitioner, the profits derived from the sale of certain art objects constituted income to the taxpayer or to the joint venturers, and (2) whether an agreement to sell certain art objects during the year 1920 was a completed transaction in that year for the purpose of determining the profit upon the sale to the joint venturers, joint owners, and the petitioner, or, whether the transaction was one in which the profit accrued on the date of the last payment.

### FINDINGS OF FACT.

The facts relating to the first issue, namely, whether the profits derived from the sale of certain art objects transferred to the petitioner, a New York corporation, by certain joint venturers under a contract dated October 17, 1917, constituted income to the corporation or to the joint venturers, have heretofore been considered by the Board and are fully set forth in the findings of fact in the *Appeal of Parish-Watson & Co.*, 2 B. T. A. 851. The facts found by the Board in that appeal with reference to this issue are made a part of these findings of fact as fully as if set forth in detail herein. The agreement of October 17, 1917, was in effect during the taxable years 1920 and 1921.

Early in December, 1918, M. Parish-Watson, president and treasurer of the petitioner, obtained permission from one John M. Willys to place in his residence 16 art objects with the view of interesting him in the purchase thereof. These art objects remained in Willys' home until about June, 1919, when he left New York for Europe, at which time they were removed. Upon his return in the fall of 1919, with his permission, they were again placed in his residence. In December, 1919, M. Parish-Watson and Willys discussed the matter of the purchase by the latter of the art objects; also the terms of the sale. Willys indicated his willingness to enter into an agreement relating to purchase by him of the 16 art objects, upon certain contingencies. The petitioner was desirous of entering into a contract the terms of which would postpone the payment of the sales tax until a further date. It had knowledge of a contract entered into between another art dealer and the vendee by the terms of which the vendor retained legal title to the articles sold upon the deferred payment plan under which the Treasury Department had held that the sales tax became due when title passed to the purchaser.

On January 24, 1920, the petitioner wrote to Willys as follows:

Pardon my delay in not having sent to you sooner the bill covering the purchase of the porcelains, which I enclose herewith, together with memorandum of agreement which is acceptable to the Treasury Department for the deferred payment plan. This will put the final settlement of tax off until final payment of the account is made.

If you have any better suggestion to make I shall be glad to discuss it with you.

The three pieces of pottery you will note are not subject to tax as they come under the "pottery" classification.

I also enclose a copy of a letter from the Treasury Department which shows us the authority for this ruling.

Early next week I shall try to get in touch with you.

With the above-mentioned letter there was transmitted the following memorandum:

MEMORANDUM OF AGREEMENT between Parish-Watson & Co., Inc., called the vendor, and J. A. Van Wie, called the purchaser:

In consideration and as a condition of the vendor having agreed to sell and deliver to the purchaser the work of art described below upon terms of deferred payment, it is mutually understood and agreed that the title to such work of art is to remain in the vendor until it is fully paid for, and that it may be re-taken if not paid for as agreed.

With this letter there was transmitted a list of the 16 articles and the price of each, totaling $299,800. Thereafter, verbal negotiations were carried on between the petitioner and Willys, and his agent J. A. Van Wie, with the result that on July 16, 1920, the above-mentioned memorandum agreement was signed by the taxpayer and J. A. Van Wie, Willys' agent, to which was attached and made a part thereof a list of the art objects, as follows:

| | | |
|---|---|---:|
| D. J. | 167 | $58,500 |
| W. | 176 | 48,000 |
| | 810/6831 | 25,000 |
| P. | 348 | 16,000 |
| J. | 303 | 36,000 |
| T. | 1512/13 | 16,000 |
| T. | 440 | 6,000 |
| D. J. | 139 | 4,500 |
| D. J. | 221 | 8,500 |
| S. | 526 | 5,000 |
| T. | 407 | 7,500 |
| N. Y. J. T. | 25 | 12,000 |
| T. | 432 | 17,500 |
| T. | 431 | 12,500 |
| D. J. | 39 | 12,500 |
| W. | 197 | 14,300 |
| Total | | 299,800 |

On July 23, 1920, Willys wrote the petitioner as follows:

Referring to the Chinese porcelain and pottery purchased under a contract between yourselves and Mr. J. A. Van Wie dated July 16th, 1920, I wish to corroborate what you doubtless understood; that Mr. Van Wie personally has no interest in this purchase, but is acting as my agent.

My reason for having Mr. Van Wie's name used is that I think it just as well for the time being· that my name does not apear in the transaction.

I understood as one of the conditions of this purchase that I am to have the privilege, up to date of final payment, to exchange any piece in this purchase for any other article or group of articles of a similar value which I may select from your collection.

On the same date J. A. Van Wie wrote the petitioner as follows:

Referring to your Memorandum of Agreement this day entered into between your company and myself for the purchase and sale of certain works of art, described in said agreement, desire, in order that there shall be no misunderstanding, to record herein my understanding as to the price to be paid for said works of art and the terms of payment therefor.

The purchase price was to be $299,800.00, payable $100,000.00 in cash (which was paid to you on July 10th, 1920), $50,000.00 to be paid November 10th, 1920, $114,000.00 to be paid January 10th, 1921 and $35,800.00 to be paid on January 10th, 1922. I am to have the privilege of anticipating any and all of said payments and when they are completed the title to said property is to vest in me.

If the above is your understanding, kindly so indicate in writing and we will consider this letter, together with your acknowledgment, a part of said agreement.

On August 3, 1920, the petitioner wrote J. A. Van Wie as follows:

Referring to your favor of July 23rd regarding the agreement to purchase works of art from this firm, it is understood that the purchase price is $299,800, payable $100,000 in cash (receipt of which we hereby acknowledge as of July 10th, 1920), $50,000 to be paid November 10th, 1920, $115,000 to be paid January 10th, 1921, and $35,800 to be paid on January 10th, 1922. It is further understood that you have the privilege of anticipating any and all of said payments, and when they are completed the title to said property is to vest in you.

About the same time it was verbally agreed between the petitioner and Willys that he should have the right, at any time before the date fixed for the final payment, to return any or all of the articles and receive back any payments made, or to cancel the contract as to the remaining payments; less 10 per cent of the amount originally agreed upon as the price to be paid.

On July 10, 1920, Willys paid $100,000 in cash. On November 20, 1920, he paid the next installment of $50,000. The remaining $149,800 was paid as follows: $25,000, January 13, 1921; $15,000, February 24, 1921; $10,000, July 14, 1921; $10,000, August 17, 1921; $10,000, September 21, 1921; $10,000, October 14, 1921; $10,000, March 9, 1922; $10,000, April 10, 1922; $10,000, May 10, 1922; $20,000, September 21, 1923; and $9,160, March 18, 1924.

The 16 art objects sold to Willys were not all owned outright by petitioner. The profit upon the sale of certain of the articles be-

longed to the joint venturers—Perine, Parish-Watson, Michael Dreicer, and Jacob Dreicer,—under the terms of the agreement of October 17, 1917, set forth in detail in the *Appeal of Parish-Watson & Co.*, 2 B. T. A. 851. Certain of the other articles sold were owned by the joint venturers subject to the right of the petitioner to receive one-half of the profit on the sale thereof under the agreement of October 17, 1917. Certain of the articles were owned outright by the petitioner. In certain others it had a joint ownership with French & Co., of New York, H. A. E. Jaehne, of New York, and Frank Partridge, of London. Some of the articles were on consignment to the petitioners for the estate of Edward Gorer, of London, and the petitioner's interest in the sale thereof was one-half of the net profits.

The petitioner did not enter the transaction upon its books as a sale until the final payment was made in March, 1924, but as each payment on account was received it allocated the same against the purchase price of each object as listed in the agreement of sale in the order in which said article appeared on that list. After such allocation it set up in the running account which it kept for each of the four venturers and each of the four joint owners the amount due each joint venturer and joint owner. Only the estate of Edward Gorer drew against the credit thus set up. French & Co. were indebted to the petitioner in sums in excess of the amount which they were entitled to receive as their share of the profits on the sale to Willys. Nothing could be determined as to H. A. E. Jaehne's account until a final settlement of accounts was had. The joint venturers' account was not settled until after final payment by Willys in March, 1924. All of the interested parties understood that the determination of the profit to which each should be entitled was to be suspended until final payment. The articles sold were carried by the petitioner at its risk under its general insurance policy until final payment was made on March 18, 1924.

A commission of $8,000 was paid to H. Reinhardt for his services in connection with the sale. The total profit upon the sale of the articles mentioned, less the commission of $8,000, was $161,670.93, which belonged, and constituted income, to the following persons in the amounts specified:

| | |
|---|---:|
| French & Co. | $12,637.67 |
| Gorer Estate | 13,689.62 |
| H. A. E. Jaehne | 21,373.64 |
| Frank Partridge | 6,569.78 |
| Joint venturers—Perine, Parish-Watson, Michael Dreicer, and Jacob Dreicer | 35,815.05 |
| Parish-Watson & Co. | 71,585.17 |
| Total | 161,670.93 |

In addition to the profit of $161,670.93, the Commissioner included in the petitioner's income the sum of $5,468.70, representing profit on the sale of art objects to persons other than Willys, which profit belonged, under the terms of the agreement of October 17, 1917, to the four joint venturers—Perine, Parish-Watson, Michael Dreicer, and Jacob Dreicer.

The petitioner kept its books and rendered its returns upon the accrual basis.

Upon examination of the returns for 1920 and 1921, the Commissioner denied a deduction of $8,000 as commission paid to Reinhardt, determined a profit of $169,670.93 upon the articles sold to Willys, and included this amount, together with a further profit of $5,468.70 upon articles sold by it under the terms of the contract of October 17, 1917, with the joint venturers, in the income of the petitioner for the calendar year 1920.

OPINION.

LITTLETON: The Board heretofore decided, in the *Appeal of Parish-Watson & Co.*, 2 B. T. A. 851, that, under the terms of the agreement of October 17, 1917, the profit on the sale of the art objects belonging to the four joint venturers—W. D. N. Perine, M. Parish-Watson, Michael Dreicer and Jacob Dreicer—constituted income to them and not to the petitioner. That agreement was in force during the years 1920 and 1921, and the profit upon the sale of the art objects belonging to the joint venturers under the terms of this contract and sold to Willys, and others, by the petitioner was erroneously included by the Commissioner in its income. As to certain of the objects sold, persons other than the petitioner had a joint interest therein and were entitled to share in the profits of the sale. Without discussing the evidence in detail, the Board has set forth in the findings of fact the profit which each joint venturer, each joint owner, and the petitioner received upon the sale of the 16 articles, and, in determining the tax of this petitioner in accordance with this opinion, only $71,585.71 should be included as income to it from that source. The amount of $5,468.70, representing profit upon the sale during 1920 of certain art objects belonging to the joint venturers, constituted income to them and should not be included as income to the petitioner in that year.

In making its returns for 1920 and 1921, the petitioner did not include as income any amount on account of payments made by Willys, upon the ground that the transaction was not a completed sale until final payment was made and whatever profit accrued to it constituted income at that time.

The Commissioner contends that the parties intended that there should be and that there was, in fact, a sale in July, 1920, and that the profit thereon accrued at that time.

We can not agree with the Commissioner's contention that there was a completed sale in 1920 on which the petitioner realized a profit or sustained a loss. The contract provided (1) that the purchase price to be paid should be $299,800, subject to certain conditions hereinafter mentioned, (2) that the articles sold remained in Willys' hands, (3) that title should remain in the petitioner until paid for as provided in the contract and that petitioner should carry the insurance thereon, (4) that Willys should pay $100,000 in cash and $199,800 in installments, namely, $50,000 on November 10, 1920, $114,000 on January 10, 1921, and $35,800 on January 10, 1922, (5) that he might anticipate any or all of the deferred payments and thereby claim title to the article or articles, (6) that he might exchange before the time fixed for the final payment any of the listed articles for another or a group of similar articles in petitioner's collection, and (7) that he might return any or all of the articles before the date fixed for the final payment and receive back all payments made and cancel any remaining payments, less 10 per cent of the amount originally agreed upon as the price to be paid.

We are not here dealing with the ordinary case of a sale with an extension of time for making the payment and retention by the seller during that time of legal title as security for the unpaid purchase price. This contract was nothing more than a continuing offer of Parish-Watson & Co., Inc., to sell the 16 art objects for the price set forth in the list furnished, totaling $299,800. By it Willys had the option or privilege of accepting the offer and purchasing the articles or of refusing to purchase the same through the exercise of the option given him by the contract by forfeiting 10 per cent of the price agreed upon. Under these circumstances, it was not definitely known, during either of the years 1920 or 1921, by either party that Willys would purchase the articles. He had not exercised the option to cancel the contract, nor had he indicated that he would elect to purchase. He exercised one of the privileges given him by the contract and returned an article on which the profit would have been $25,000 for one on which a profit of only $16,000 inured to the petitioner.

An offer to buy or sell becomes completed and binding when the person to whom it is made accepts it and communicates his acceptance or performs some act in compliance with the terms of the offer upon which his acceptance, so as to bind him, may be implied. An offer, unless withdrawn, may be accepted within a time expressly limited, and where such time is given it is not a completed contract

or a sale of property until formal acceptance or until the time expressly fixed at or after which the purchaser may, by word or action, indicate his acceptance. The parties stipulated that the purchaser should have the right to purchase the property or not, as he saw fit, within the time specified, namely, January 10, 1922. There was a valuable consideration for this option, since Willys agreed to pay 10 per .cent of the stipulated price if he should not purchase, without which the contract between the parties would have been void for lack of mutuality of engagement. Where there is an option in a contract to rescind, if the time within which the option can be exercised is prescribed, such condition must be complied with and a failure to comply with it terminates the option and the sale becomes absolute and completed.

The Board is of the opinion that, under the terms of this contract and the evidence before it, this was not a completed sale in either of the years 1920 or 1921, resulting in the realization of a gain or the sustaining of a loss by the petitioner. And since the question of tax liability for years subsequent to 1921 is not before the Board it is not necessary to consider it, or to decide at what time subsequent to 1921 the transaction was completed for the purpose of computing the gain or loss.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*